IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> v. <br><br> **MOUNTEE BROWN,** <br><br> Defendant. | **Criminal No. TDC-25-0073** |

<u>**UNITED STATES SENTENCING MEMORANDUM**</u>

The United States of America, by undersigned counsel, hereby files the following sentencing memorandum in support of a sentence at the low end of the Sentencing Guidelines range. Such a sentence would be sufficient, but not greater than necessary to fulfill the requirements of 18 U.S.C. § 3553(a). The Defendant committed a serious crime, using his position as a bank teller to steal the identities and savings of innocent people. While certain mitigating factors discussed below may counsel for some leniency within the applicable guideline range, a significant sentence is necessary to account for the seriousness of this offense and to provide deterrence to the Defendant and others.

I.   **Facts**

Mountee Brown was a bank teller in Upper Marlboro, Maryland, where he was trusted with access to customer's sensitive information in order to make deposits and conduct withdrawals. Along with many other accounts, the Defendant had access to the accounts of Victim #1, age 48, Victim #2, age 87, Victim #3, age 81, Victim #4, age 86, and Victim #5, age 89. These customers trusted the bank and the Defendant not only to protect the funds under the custody of the bank, but also the customers' personal identifying information. Instead, in October and November 2022, the Defendant joined a conspiracy to defraud the bank and Victims #1

through 5 by making 26 unauthorized cash withdrawals from victim bank accounts, stealing a total of $255,000. The Defendant worked with at least three other co-conspirators to conduct the withdrawals and received a percentage of the fraudulent proceeds.

According to the agreed-upon statement of facts, the Defendant's co-conspirators approached him at his designated teller station as though they were customers withdrawing money from their own accounts. The co-conspirators would provide the Defendant the victims' account information. The Defendant then falsely wrote on the withdrawal tickets that he verified the customer conducting the transaction. The Defendant bypassed bank internal controls by documenting that the co-conspirators were "Known Clients" in the bank's internal system, which allowed him to conduct the transaction without inputting identification information such as a driver's license number or passport number to verify the customer. In addition, on at least twenty-five transactions, the Defendant entered his supervisor's initials without her knowledge or consent as the employee who purportedly knew the clients conducting the transactions.

The statement of facts lays out several examples to demonstrate how the scheme worked. For example, on October 21, 2022, Co-conspirator #1 entered the bank and approached the Defendant at his designated teller station. The Defendant withdrew $10,000 in cash from Victim #1's account without Victim #1's knowledge or consent by falsely documenting that the Defendant had verified the customer and that the customer was a "Known Client," purportedly verified by the Defendant's supervisor. Co-conspirator #1 falsely signed the withdrawal ticket as Victim #1. The next day, Co-conspirator #1 returned to the bank and the Defendant assisted him by making two unauthorized withdrawals totaling $20,000 from Victim #1's account. The same day, the Defendant made a cash deposit of approximately $4,300 into his own bank account at another bank.

A few days later, on October 25, 2022, Co-conspirator #2 entered Bank A and presented account information for Victim #2. The Defendant fraudulently withdrew $10,000 in cash from Victim #2's account without Victim #2's knowledge or consent by falsely documenting that the Defendant had verified the customer, the customer was a "Known Client," purportedly verified by the Defendant's supervisor. Co-conspirator #2 falsely signed the withdrawal ticket as Victim #2. The next day, Co-conspirator #2 re-entered the bank and the Defendant withdrew $10,000 in case from Victim #3's account in the same manner, while Co-conspirator #2 falsely signed the withdrawal ticket as Victim #3.

On November 4, 2022, Co-conspirator #3 and the Defendant stole funds from two victims' accounts in the same transaction. After being presented with account information of Victims #4 and #5 by Co-conspirator #3, the Defendant processed withdrawals of $10,000 in cash from the account of both Victim #4 and Victim #5. The Defendant conducted the simultaneous cash withdrawals by falsely documenting that he verified each customer, and the customers were each a "Known Client," purportedly verified by the and the Defendant's supervisor. Co-conspirator #3 falsely signed the withdrawal tickets as Victim #4 and Victim #5, respectively.

The Defendant's personal bank account received deposits corresponding with these fraudulent withdrawals. The following is a photograph of the Defendant making a large cash deposit on October 22, 2022:



In total, between October 22, 2022, and December 6, 2022, the Defendant made cash deposits of approximately $30,200 into his personal account. In total, he withdrew $255,000 from victim accounts, losses which were ultimately taken by the bank.

## II.     Guidelines

The applicable base offense level for Count One, the Defendant's bank fraud conviction is 7, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1(a)(1). That amount is increased by 12 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(H), because the loss in this case was more than $250,000 but less than $550,000.[1] The Defendant appears to qualify for the two-level reduction for being a zero-point offender, pursuant to U.S.S.G. § 4C1.1. He also should receive a three-level reduction for acceptance of responsibility, pursuant to U.S.S.G. §§ 3E1.1(a) and (b). That results in an adjusted offense level of 14.

As to Count Two, the Defendant's aggravated identity theft conviction, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2B1.6, the term of imprisonment to be imposed is two years, to be imposed consecutive to any other sentence.

---

[1] The Government recognizes that the loss figure of $255,000 is only slightly over the threshold of $250,000. While this is the correct calculation, the Court may decide to take this fact under consideration during its consideration of the factors in 18 U.S.C. § 3553(a).

### III.   Argument

A careful consideration of the factors found in 18 U.S.C. § 3553(a) demonstrates that a sentence within the advisory Guidelines range is appropriate here. Specifically, the statute directs the Court to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C. § 3553(a).

### **The Defendant Committed a Serious Crime with Wide-Ranging Impact**

A review of the Defendant's crime shows it to be quite serious. The Defendant stole over $250,000 of money from innocent bank customers, many of whom are elderly and retired, and therefore unable to earn those funds back. These people have done nothing wrong and shoulder no blame for what occurred to them. They placed their trust with an institution like many others and should have been able to count on their funds being available when they were needed. Instead, the Defendant made the callous decision to line his pockets with their hard-earned money.

The Court has certainly seen fraud cases with higher losses. However, it must be noted that the loss is only confined to $255,000 because the bank caught onto the fraud and put a stop to it themselves. There is no telling how much more money the Defendant would have stolen and how many more victims there would otherwise be. There are no indications that the Defendant

6

regretted or reformed his conduct until he was caught. In fact, when he was first approached by the bank and questioned about his transactions, the Defendant falsely told bank associates that he had engaged in this fraud because he had been threatened by an unknown assailant in the parking lot, and he neglected to acknowledge that he was a willing participant who was paid a cut for his services.

It is no doubt a relief to victims that the bank has reimbursed them for the funds stolen from their bank accounts by the Defendant. However, this does not mitigate the seriousness of the offense. For one, the bank has not been reimbursed for these funds, and the bank undoubtedly suffered additional reputational damage. In addition, the Court should consider the long-term damage done by identity theft, and specifically this identity theft. Identity theft leaves victims feeling confused, scared, embarrassed, and ultimately distrustful of others. This is not a harm that dissipates quickly. Depositing a paycheck in a bank should not be an event that triggers apprehension. The Court's sentence should reflect not only the monetary damage from the Defendant's bank fraud, but also the psychological damage caused by the Defendant's identity theft.

### The History and Characteristics of the Defendant

The Defendant has no criminal history. This appears to be his first brush with the law, which is to his credit. The Defendant appropriately received a 2-level decrease in his advisory guideline range to account for this. The Court should balance any additional "first time offender" consideration with the nature of the crime and the Defendant's role in it. Taken together, a Guidelines sentence is appropriate.

This crime was not a single mistake or a momentary lapse in judgement. It spanned a month and involved 26 different fraudulent transactions, in addition to the meetings he had to

collect the cash from his co-conspirators and his trips to deposit it into his account rather than returning it to victims. He processed one transaction after another without taking the many off-ramps available to him. The Defendant did not make just one mistake. He continuously took steps to further the fraud until he was stopped.

### The Sentence Should Deter Others in Positions with Similar Access

The United States Sentencing Guidelines calculation in this case does not include an adjustment for abuse of position of trust. That is the appropriate calculation given Note 1 to U.S.S.G. § 3B1.3 ("This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller"). However, the Defendant also should not be confused with a pickpocket who simply reached into a victim's open purse, or with a fraudster whose only role in a scheme was to withdraw money from fraudulently obtained debit cards given to him. The Defendant's position as a bank teller was a key part of this fraud. He was the gatekeeper, and the Court's sentence should deter others in similar positions from engaging in similar fraud.

Simply put, without the Defendant's access to sensitive bank account and personal identifying information, this scheme does not function. The Defendant's co-conspirators were unable to dupe bank tellers into believing they were the true owners of the bank accounts. They needed the Defendant to withdraw the funds for them, and to do so in a way that would look legitimate if someone were to audit the transactions. In the process, the Defendant essentially stole his supervisor's identity by using the supervisor's initials to facilitate the fraud.

Even if bank tellers like the Defendant do not technically hold "Positions of Trust" per the Sentencing Guidelines, they are the sort of people we entrust every day with our sensitive information. Our willingness to trust bank tellers, cashiers, administrative assistants, and others with our sensitive information allows society to function.

The Court's sentence should send a message to those entrusted with similar sensitive information that, should they violate that trust, a significant punishment awaits them.

## IV.     Conclusion

For the reasons stated above, the Government requests this Court sentence Defendant Mountee Brown to a term of imprisonment within the United States Sentence Guidelines that is sufficient but not greater than necessary to meet the factors found at 18 U.S.C. § 3553(a).

                Respectfully submitted,

                Kelly O. Hayes
                United States Attorney

By: _____/s/_____
      Sean R. Delaney
      Darren S. Gardner
      Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that this filing was served on the Defendant via ECF electronic filing.

                              ___/s/_____
                              Sean R. Delaney
                              Assistant United States Attorney